AUTO-OWNERS INSURANCE             )
COMPANY, *et alia*,               )
                                  )
    Plaintiffs,                   )
                                  )
    v.                            )    CAUSE NO. 2:12-CV-184 JD
                                  )
LAKE ERIE LAND COMPANY, *et alia*, )
                                  )
    Defendants.                   )

## OPINION AND ORDER[1]

    This is an insurance coverage dispute. A pair of insurers sued an insured, in a declaratory

judgment action, to relieve themselves of any duty to indemnify the punitive damages portion of a

recent jury verdict against that insured. While this case was pending, the insured was sued once

more, and the issues of coverage for that second suit have been added to the pleadings by

amendment. The insured believes a conflict of interest exists entitling it to independent defense

counsel in the second suit, paid for at the insurers' expense, and moved for partial summary

judgment on the issue. This Court agrees, and the motion is granted.

### Background

    In the early 2000s, Defendant/Counterclaim Plaintiff Lake Erie Land Company ("LEL") built

a "wetlands mitigation bank" in Lake Station, Indiana.

> A wetlands mitigation bank is a parcel of land upon which new wetlands are created
> by promoting the growth of wetlands vegetation upon suitable soils with adequate
> hydrology. Once established, wetland credits can be sold from the bank to persons
> or entities in need of the credits in the development of their own parcels of land.
> These individuals can effectively mitigate their damage to the environment by
> creating replacement wetlands for those destroyed.

---

[1]    The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"].

*B&B, LLC v. Lake Erie Land Co.*, 943 N.E.2d 917, 920 n. 2 (Ind. Ct. App. 2011). Plaintiffs/Counterclaim Defendants Auto-Owners and Property-Owners (collectively "Plaintiff Insurers") insured LEL and the wetlands mitigation bank during the years relevant to this lawsuit under a Commercial General Liability Policy ("CGLP") and an Umbrella Policy ("UP") containing excess liability coverage.

In 2008, a neighboring landowner, B&B, LLC, sued LEL in state court. B&B claimed that its own property had been damaged and rendered unusable as a result of LEL's creation of the wetlands mitigation bank. Allegedly, the newly-created wetlands "spilled over" and turned B&B's property into a marsh. The Plaintiff Insurers defended LEL in the B&B lawsuit under a reservation of rights and through counsel of their choice, as was required by the insurance policies at issue. The jury in the B&B lawsuit found against LEL.[2] It awarded B&B roughly $1.8 million in compensatory damages and $1.5 million in punitive damages. On April 6, 2012, LEL demanded that the Plaintiff Insurers pay both the compensatory and punitive damages portions of the judgment. [DE 1 ¶ 28].

The Plaintiff Insurers filed this declaratory judgment action on May 8, 2012, in order to limit their duty to indemnify the B&B lawsuit verdict under the CGLP and the UP. With respect to the CGLP, they argued, first, that the CGLP does not require Property-Owners (the issuer thereof, *see* DE 1 ¶ 30) to pay punitive damages [DE 1 ¶¶ 21-31] because they fall outside of the definition of "bodily injury," "property damage," "advertising injury," or "personal injury." They also argued [DE 1 ¶¶ 32] that there is no coverage for punitive damages because the policy excludes damages "expected or intended by the insured." Finally, they argued against any coverage beyond the policy

---

[2] The suit actually proceeded to trial twice, with an intervening appellate reversal, and the verdict at issue in this case was the product of the second trial.

limits of $1 million [DE 1 ¶¶ 33], and argued that public policy mitigates against making insurers responsible for wilful or malicious conduct by insureds. [DE 1 ¶ 34].

With respect to the UP issued by Auto-Owners, the Plaintiff Insurers made the same arguments, but added that coverage for punitive damages is specifically excluded by the terms of that policy. [DE 1 ¶ 37-47]. Obviously, the issues raised by the Plaintiff Insurers' complaint have not yet been resolved.

On July 31, 2012, while the case *sub judice* was already pending, a second neighboring landowner filed a lawsuit against LEL alleging property damages resulting from the overflow of the wetlands mitigation bank (the "Hite Lawsuit"). [DE 50-1]. LEL notified the Plaintiff Insurers of the Hite Lawsuit and asked them to indemnify and defend. In doing so, LEL informed the Plaintiff Insurers that it believed, based in part on the existence of this declaratory judgment action, that a conflict of interest was present entitling LEL to retain independent defense counsel for the Hite Lawsuit at the Plaintiff Insurers' expense. [DE 43 at 7-8]. The Plaintiff Insurers agreed to indemnify and defend, but under a reservation of rights. [DE 43 at 22]. In the reservation of rights letter, the Plaintiff Insurers insisted on using their own defense counsel, the same attorney in the B&B lawsuit. Finally, the Plaintiff Insurers also explicitly notified LEL that they will not cover treble or punitive damages, will not cover statutory costs or fees, and will not cover an excess verdict over policy limits. [DE 43 at 22-25].[3]

Through amendments to the pleadings, the Hite Lawsuit (and the issue of independent defense counsel) were added to this declaratory judgment action. [DE 34]. On December 20, 2012, LEL filed a motion for partial summary judgment on the question of whether a conflict of interest exists which entitles LEL to retain independent defense counsel in the Hite lawsuit. [DE 41]. On

---

[3]    The Hite Lawsuit does seek punitive and treble damages. [DE 50-1 ¶¶ 42-44].

January 17, 2013, the Plaintiff Insurers responded. [DE 48]. Within their response, the Plaintiff Insurers asked for partial summary judgment in their favor on the same issue. While that does not technically rise to the level of a cross-motion, it does tend to show that both parties believe this question is one appropriately resolved at the summary judgment stage. On February 4, 2013, LEL replied. [DE 54]. The Court heard oral argument on the motion and took it under advisement.

## Standard of Review

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Even if the Court were to construe the Plaintiff Insurers' competing request for relief as a cross-motion, that would not change the standard of review. *M.O. v. Indiana Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are typically analyzed

4

separately under the standards applicable to each. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). In any case, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Finally, the Court notes that claims involving an attorney's conflict of interest present mixed questions of law and fact. *See Reynolds v. Chapman*, 253 F.3d 1337, 1342 (11th Cir. 2001).

## Discussion

The question before the Court is whether a conflict of interest exists sufficient to entitle LEL to independent defense counsel. The parties agree that the dispute is governed by Rule 1.7(a) of the Indiana Rules of Professional Conduct, which reads:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1)     the representation of one client will be directly adverse to another client; or
>
> (2)     there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

*See also Armstrong Cleaners, Inc. v. Erie Ins. Exchange*, 364 F.Supp.2d 797 (S.D. Ind. 2005). Rule 1.7(a) does not create a *per se* rule of any sort:

> Under this standard, attorneys, parties, and courts cannot resort to easy rules of thumb. *See Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 161 (Ind. 1999) (refusing to adopt a broad prohibition on insurer's in-house counsel from representing policyholders; any abuses of rules of professional conduct can be handled on a case by case basis); *Dolatowski v. Estate of Rondinelli*, 692 N.E.2d 915, 919 (Ind. Ct.

App. 1998) (explaining that the question of whether an impermissible conflict of interest exists under Rule 1.7 "often is one of proximity and degree"); *see also* Comment 8 to Rule 1.7, as amended Sept. 30, 2004 ("The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."). "There is no talismanic rule that allows a facile determination of whether a disqualifying conflict of interests exists. Instead, '[t]he potential for conflict requires a careful analysis of the parties' respective interests to determine whether they can be reconciled . . . or whether an actual conflict of interest precludes insurer-appointed defense counsel from presenting a quality defense for the insured.'" *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon, & Gladstone*, 79 Cal.App.4th 114, 93 Cal.Rptr.2d 534, 545–46 (2000) (quoting *Dynamic Concepts, Inc. v. Truck Ins. Exchange*, 61 Cal.App.4th 999, 71 Cal.Rptr.2d 882, 888 (1998)).

*Armstrong Cleaners*, 364 F.Supp.2d at 800. In short, resolution of the issue "requires a close look at the nature of the conflicting interests, the issues in the underlying litigation, and the risk that the attorney's relationship with the insurer will materially limit his representation of the insured." *Id.* at 816. It is a case-specific and fact-sensitive inquiry in which the Court must look at which issues will necessarily be evidenced or proved in the underlying litigation, and whether there is a significant risk that any issues will be resolved which will in turn affect the coverage determination. *Id*.

Where the parties differ, of course, is on how these rules apply to the facts of this case. LEL believes there are three "conflict levels" in this case entitling it to independent defense counsel: (1) the operation of the "expected/intended exclusion" in the policy, given the presence of a question of wilfulness in the Hite Lawsuit; (2) the threat of treble or punitive damages in the Hite Lawsuit; and (3) the chance of an excess liability verdict over the $1 million policy limit. [DE 42 at 9-11]. The Plaintiff Insurers believe none of the foregoing create an "actual" conflict rising to the level necessary to require independent defense counsel. LEL's arguments are more persuasive, and the

Court does believe a conflict of interest exists in this case because there is a significant risk that issues may be resolved in a manner that will impact insurance coverage.

A.     **The Expected/Intended Harm Exclusion**

The "Insuring Agreement" portion of the CGLP applicable to the time period in question contains a general grant of coverage for damages resulting from "bodily injury" or "property damage" as defined by the policy. [DE 1-1 at 79]. That coverage is subject to policy limits, and also subject to certain specific exclusions. [DE 1-1 at 79]. Particularly relevant here, the CGLP provides:

This insurance does not apply to:

   a.      "Bodily injury" or "property damage" *expected or intended from the standpoint of the insured*.

[DE 1-1 at 79 (emphasis added)]. The UP contains the same exclusion. [DE 1-2 at 22]. The Plaintiff Insurers expressly relied on these provisions when asserting a lack of coverage under either policy for the B&B Lawsuit verdict in the original complaint in this case. [DE 1 ¶¶ 32, 43]. They also expressly rely on these provisions in various ways to defeat coverage in the Hite Lawsuit, as it has been added to this action through amendments to the pleadings. [DE 37 ¶¶ 13-14 (affirmative defenses to LEL's counterclaim); ¶¶ 26, 33 (third-party complaint against remaining parties to the Hite Lawsuit)]. Plaintiff Insurers' attempt to withdraw the affirmative defenses in light of the present dispute was defeated. [DE 81]. Accordingly, it is not genuinely disputable that the question of whether the harms alleged in the Hite Lawsuit were "expected" or "intended" is a crucial one to the issue of coverage under both the CGLP and the UP.

Given that, LEL argues that a conflict of interest exists relative to the Hite Lawsuit because the nature of LEL's conduct – was it merely negligent, or wanton and wilful? – is at issue in that suit. [DE 50-1 ¶¶ 14-24 (alleging negligence); ¶¶ 42-44 (seeking treble or punitive damages, which

must be predicated on a finding of wilful or wanton misconduct)]. LEL's position is that presence of two different "ways in which LEL can lose," one of which – wilful misconduct – would necessarily involve a finding excusing the Plaintiff Insurers from coverage, and one of which – negligence – would mean coverage *does* exist, means that an attorney retained and paid by the Plaintiff Insurers would feel pressure to steer the litigation towards the finding in his "real" client's best interests: the one supporting a lack of coverage.

There is good authority in support of LEL's arguments. For example, it seems to fit the paradigmatic example of a conflict provided by Judge Hamilton in *Armstrong Cleaners*, wherein there is a significant risk that an issue will be decided in the underlying litigation which affects the coverage dispute. 364 F.Supp.2d. at 816. Similarly, in *Am. Fam. Mut. Ins. Co. v. CMA Mortg., Inc.*, 682 F.Supp.2d 879 (S.D. Ind. 2010), Judge Evans Barker reached a parallel conclusion:

> [T]he underlying facts establish that, in response to CMA's tender of defense, American Family wrote to CMA explaining that it was reserving its rights to deny coverage for various reasons, including that it believed an exclusion in its policy applied which excludes coverage for personal and advertising injury "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another . . . ." This position taken by American Family created an immediate conflict of interest between it and CMA insofar as a finding of intentional conduct would benefit American Family but not CMA, given that CMA was exposed to additional damages based on Wanek's and the plaintiff class's demand for enhanced damages for a willful violation. An insurer faced with such a conflict is required to reimburse its insured's independent counsel as part of its duty to defend. *All-Star Ins. Corp. v. Steel Bar, Inc.*, 324 F.Supp. 160, 165 (N.D.Ind. 1971); *Liberty Mutual Ins. Co. v. Metzler*, 586 N.E.2d 897, 902 (Ind. 1992); *Snodgrass v. Baize*, 405 N.E.2d 48, 51 (Ind. Ct. App. 1980).

682 F.Supp.2d at 890-891. The Plaintiff Insurers acknowledge these cases and their general applicability, but argue that this case is different. At oral argument, counsel suggested that there really are not "two ways to lose" in this case, because there is no separate evidence or theory of the case concerning whether the alleged intrusion was merely negligent or wilful and wanton; in either

case, the only thing for defense counsel to do is argue against the fact of the occurrence itself. Accordingly, their position is that counsel's performance is not impacted by the fact that there are two theories alleged in the complaint.

The Plaintiff Insurers' position is not persuasive. First, contrary to the Plaintiff Insurers' argument, there is a very real way in which counsel's handling of the Hite Lawsuit defense could influence the coverage dispute: by addressing (or not addressing) LEL's "state of mind" in allegedly trespassing or causing damage to the Hite property. For example, an attorney loyal *only* to LEL would surely make a point of arguing that even if the wetlands *were* constructed in such a way as to cause damage to the Hite property, LEL had no knowledge nor reason to believe such consequences would occur, and thus acted in a manner that was merely negligent. Thus, even in the case of an adverse jury verdict, LEL might be protected against treble or punitive damages (which require a finding of wilfulness). But an attorney loyal primarily to the Plaintiff Insurers has no reason to make that "even if" argument; since the Plaintiff Insurers believe treble and punitive damages are not covered under either policy, it does not make sense for them to steer the litigation towards a negligence verdict as a "backup plan." To the contrary, it would be in the Plaintiff Insurers' best interests to steer the litigation toward a finding of *wilfulness*, in the event that the jury appears ready to find against LEL. In that way, as large a portion of the judgment as possible might be shoe-horned into a category of damages for which the Plaintiff Insurers do not believe they are contractually responsible. Finally, it is not difficult to see how these issues would come up. The alternative state-of-mind theories are alleged in the complaint. The attorney representing the Hites is therefore nearly certain to at least attempt to introduce evidence thereof, and defense counsel will need to respond. As a result, defense counsel may not have the option of focusing only on the

"common ground defense" that the trespass or intrusion never occurred, as Plaintiff Insurers seem to believe he will.

Second, it seems clear to the Court that the risk of conflict in this case is not only a possibility, but is significant, both in terms of the likelihood that the jury in the Hite Lawsuit actually resolves the state-of-mind issue, and in terms of the likelihood that the Plaintiff Insurers will rely on that determination as a coverage defense. With respect to the first point, LEL's concern that a punitive damages finding based on wilful misconduct might occur is rooted not only in the Hite complaint itself, but in the reality of the verdict in the highly-similar B&B Lawsuit. The fact that a jury has already found wilful misconduct on the part of LEL on very similar facts goes to show that the risk of a similar result in this case is meaningful. *See* 364 F.Supp.2d at 816. With respect to the second point, it is hard for Plaintiff Insurers to argue that the difference between a finding of negligence and a finding of wilful misconduct is not dispositive of the coverage dispute when they themselves are expressly relying on that distinction to defeat coverage in this lawsuit. Simply put, the Court believes that, on the facts of this case, the significant risk that the dispositive coverage issue of intent will be decided in the underlying lawsuit creates a conflict of interest under the governing rule and necessitates the appointment of independent defense counsel at the Plaintiff Insurer's expense. *See* Ind. R. Prof. Cond. 1.7(a)(2).

Finally, although it does not control, it is worth noting that the Court believes even the more stringent Illinois standard cited by the Plaintiff Insurers is met in this case. In *Nat'l Cas. Co. v. Forge Indus. Staffing, Inc.*, 567 F.3d 871 (7th Cir. 2009), the Seventh Circuit, applying Illinois law, stated:

> In order to determine if a conflict exists, the court "must compare the allegations of the underlying complaint against the insured to the terms of the insurance policy at issue." *Am. Fam. Mut. Ins. Co. v. W.H. McNaughton Builders, Inc.*, 843 N.E.2d 492,

498 (Ill. Ct. App. 2006). If, after comparing the complaint against the insured to the insurance policy, "it appears that factual issues will be resolved in the underlying suit that would allow insurer-retained counsel to 'lay the groundwork' for a later denial of coverage, then there is a conflict between the interests of the insurer and those of the insured." *Id*. (citations omitted).

*Id*. at 875. Indiana has intentionally adopted the wider "significant risk" approach reflected in Rule 1.7(a)(2), see *Armstrong Cleaners*, 364 F.Supp.2d at 808, but even under the narrower standard advocated by the Plaintiff Insurers, LEL would carry the day. The simple fact is that, by deciding the claims raised in the Hite Lawsuit, a jury must also necessarily decide the question of intent. The question of intent, in turn, goes a long way towards deciding the question of coverage. That clearly satisfies the *National* test, and that creates a conflict of interest.

**B.      Treble or Punitive Damages**

Since the Court finds a conflict of interest based on the first "conflict level" argued by LEL, it is not necessary to deal with the remaining two issues at length, but the Court will briefly address them before concluding this opinion. LEL argues that the threat of treble or punitive damages independently creates a conflict of interest, but in the Court's opinion this is essentially the same conflict as the first. The primary reason why the Plaintiff Insurers believe the CGLP excludes punitive coverage is because punitive or treble damages are predicated on a finding of wilful misconduct, and the CGLP excludes coverage for expected or intended harms. [DE 1 ¶¶ 31-32]. The same goes for the UP, although the UP also expressly excludes punitives attached to any finding of conduct not covered by the CGLP. [DE 1 ¶¶ 42-43]. Again, however, that just leads back to the same initial coverage question. So, to the extent that LEL's second alleged conflict overlaps with the first, it warrants independent counsel for the same reasons.

**C.      Potential for an Excess Verdict**

LEL's third alleged conflict is based on the potential for a verdict above policy limits. The argument is based on *R.C. Wegman Const. Co. v. Admiral Ins. Co.*, 629 F.3d 724 (7th Cir. 2011), a case in which the Court of Appeals, applying Illinois law, found an insurer had breached its duty of good faith by failing to timely notify an insured of the possibility of an excess verdict. In *R.C. Wegman*, the court relied on an insurer's general "duty not to gamble with the insured's money by forgoing reasonable opportunities to settle a claim on terms that will protect the insured against an excess judgment" to suggest that the likelihood of an excess verdict creates a conflict of interest. *Id.* at 725-26 (citing *Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir. 1994)). For example:

> Were it not for this duty, a duty fairly implied in the insurance contract, in a case in which a claim could be settled at or near the policy limit, yet there was a good although not certain chance that it could be beaten at trial, the insurance company would be sorely tempted to take the case to trial. For that would place it in a 'Heads I win, tails you lose,' position. Suppose the claim was for $2 million, the policy limit was $1 million, the plaintiff was willing to settle for this amount, but the defendant's insurer believed that if the case was tried the plaintiff would have a 50 percent chance of winning $2 million and a 50 percent chance of losing. The insurer's incentive would be to refuse to settle, since if it lost the trial it would be no worse off than if it settled—in either case it would have to pay $1 million—but if it won it would have saved itself $1 million.

*Id.* (citations omitted). The standard contemplated by the Court of Appeals seems to be that an insurer must notify its insured of a "nontrivial probability" of an excess verdict, and that such notification provides that "the insured has the option of hiring a new lawyer, one whose loyalty will be exclusively to him." *Id.* at 729 (citations omitted). "If he exercises that option, the insurance company will be obligated to reimburse the reasonable expense of the new lawyer." *Id.*

While recognizing that *R.C. Wegman* was decided with reference to Illinois law, LEL believes this case is similar enough so that the Court of Appeals's analysis is instructive. It is

undisputed that, in reserving its rights before agreeing to indemnify and defend the Hite Lawsuit, the Plaintiff Insurers stated that they will not cover an excess verdict over policy limits. [DE 43 at 25]. Specifically, Plaintiff Insurers stated that there is a "chance" of an excess verdict, and that they will not cover an excess verdict over the policy limit of $1 million. The reference to the $1 million figure is odd, since that is only the limit for the CGLP; the UP extends coverage by an additional $4 million to $5 million, in total. [DE 49 at 24]. Given the $5 million total, the Plaintiff Insurers claim to believe that there is no material risk of a verdict over the total policy limits. LEL disagrees, noting that over $3 million of that coverage has at least potentially already been used up by the B&B Lawsuit verdict. An identical verdict in this suit, for example, would result in an excess over coverage limits.

There are certain unknowns in this case which make it difficult to decide whether *R.C. Wegman*'s "nontrivial probability" standard is met, if it even applies to a case governed by Indiana law. The fact of a verdict over $3 million in the similar B&B Lawsuit certainly does suggest that a similarly large verdict is possible – maybe even probable – and it is undisputed that another verdict of that size would exhaust even the excess coverage provided by the UP. But at this juncture the Court knows little about the relative value of the properties owned by the Hites and B&B and the relative extent of the damage to each, so it is difficult to say just how likely a similar verdict may be. Given those uncertainties, and the fact that *R.C. Wegman* applied Illinois law, the Court would be disinclined to find a conflict warranting independent counsel on this basis alone.

That said, however, viewed in conjunction with the conflict of interest created by the expected/intended harm defense to coverage, the potential for an excess judgment does add support to the Court's decision. Ultimately, the concern in a conflicts case is an ethical one: whether a lawyer can properly discharge his duty to two clients with divergent interests. What matters is

whether "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client," *see* Rule 1.7(a)(2), and the combination of a less obvious conflict like the potential for an excess verdict with the more obvious conflict based on the coverage defenses just goes to show that these two "clients" are so at odds with each other that *no* attorney can reasonably be expected to properly serve the interests of both. There is nothing speculative, in this case, about whether or not the parties will end up disputing coverage. It is already happening, in this very lawsuit.

## Conclusion

In conclusion, the very real probability that the jury in the Hite Lawsuit will decide issues of fact potentially dispositive of the coverage dispute pending in this Court entitles LEL to independent defense counsel at the Plaintiff Insurers' expense. LEL's motion for partial summary judgment [DE 41] is therefore **GRANTED**. To the extent that the request for relief contained in Plaintiff Insurers' response [DE 48] can be construed as a cross-motion, it is **DENIED**.

SO ORDERED.

ENTERED:   August 13, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court